IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAWRENCE E. PETERSON, JR.,       )
                                 )
            Petitioner,          )
                                 )
        v.                       )        1:03CV00651
                                 )
MARVIN POLK, Warden,             )
Central Prison,                  )
Raleigh, North Carolina,         )
                                 )
            Respondent.          )
_____

MEMORANDUM OPINION

Tilley, District Judge

        This matter is before the Court on Petitioner Lawrence E. Peterson, Jr.'s

Petition for Writ of Habeas Corpus (Doc. # 2) pursuant to 28 U.S.C. § 2254.  For

the reasons set forth below, the Recommendation of the United States Magistrate

Judge to deny habeas relief (Doc. # 18) is ADOPTED and the habeas petition is

DENIED.

                                    I.

        The facts as found by the North Carolina Supreme Court on direct appeal are

adopted and elaborated on when necessary to respond to Petitioner's objections.

The facts are as follows:

        Defendant was indicted on 19 February 1996 for the 5 July 1995
        robbery with a dangerous weapon and first-degree murder of sixty-
        seven-year-old Jewel Scarboro Braswell, the proprietor of a grocery
        and general store in Richmond County.  On 2 December 1996, prior to

jury selection, defendant entered a plea of guilty to first-degree murder on the basis of premeditation and deliberation and a plea of guilty to robbery with a dangerous weapon.[1]  At the conclusion of a capital sentencing proceeding pursuant to [N.C. Gen. Stat.] § 15A-2000, the jury found as aggravating circumstances that defendant had been previously convicted of a felony involving the use of violence and that the murder was committed for pecuniary gain.  Of the three statutory and twelve nonstatutory mitigating circumstances submitted to the jury, none was found by any of the jurors.  The jury recommended a sentence of death for the first-degree murder, and the trial court sentenced defendant accordingly. The trial court also sentenced defendant to 103 to 133 months' imprisonment for the robbery conviction.

The evidence presented at the sentencing hearing showed that around 9:00 a.m. on the morning of 5 July 1995, defendant, twenty-five years old at the time, pawned some appliances at a local pawn shop in Winston-Salem and redeemed his Chinese SKS semiautomatic assault rifle, a weapon that can be bought in many department stores and that holds ten rounds of ammunition per magazine clip.  Around midday he bought some gas and a soft drink in Richmond County at Braswell's Grocery.  Mr. Lewis Braswell, sixty-seven, waited on defendant and gave him his change.  Defendant asked Mr. Braswell if he could pull his car over and rest for a while, and Mr. Braswell replied that that would be fine.  Mrs. Jewel Braswell, also sixty-seven years old and the wife of Lewis Braswell for forty-four years, then came over from their home, directly adjacent to the store, and took care of the store while Mr. Braswell went home to eat lunch.

While in his kitchen, Mr. Braswell heard defendant's voice over the intercom connecting the house to the store; so he walked back to the store.  Looking in the back window of the store, he saw his wife showing defendant out the front door and telling him, "Drive careful out there; there's a lot of traffic on the road today."  Mr. Braswell then returned to his house to eat lunch. He then heard defendant's voice over the intercom a second time and, thinking something was not right, went back to the store again. Halfway there, he heard the

---

[1]  Petitioner pled guilty pursuant to <u>North Carolina v. Alford</u>, 400 U.S. 25, 91 S. Ct. 160 (1970), which allows a defendant to plead guilty "even if he is unwilling or unable to admit his participation in the acts constituting the crime."

2

rapid firing of gunshots.

When Mr. Braswell reached the rear window of the store, he observed defendant, alone, walking out the front door with what looked like a rifle in his left hand down by his side. Mr. Braswell entered and found his wife behind the cash register, bloodied and with no pulse. Mr. Braswell grabbed his twelve-gauge shotgun, ran out the front door, and saw defendant pulling away. Braswell fired two shots, striking defendant's vehicle; but defendant got away, driving north. Mr. Braswell then called for an ambulance and for the police.

Law enforcement officers quickly tracked defendant's vehicle. Ultimately, defendant swerved off the road onto the right-hand shoulder, exited the vehicle, and was arrested. The officers found the assault rifle on the back seat with the safety off, one round in the chamber, and four more bullets in the magazine. Defendant produced $69.00 from his pants pocket as the proceeds from the robbery and killing. He also gave a statement to police indicating that when he went back into the store with the rifle, he ordered the victim to open the cash register and give him the money, and then shot the victim.

The pathologist who performed the autopsy on Mrs. Braswell testified that he found five gunshot wounds that passed completely through her body. Four of those wounds caused massive hemorrhaging and damage to the lungs, liver, bowel, and spinal cord: (1) one entered the right chest and exited out the right back; (2) another entered just above the right clavicle and exited further down on the right back; (3) a third entered the base of the neck and exited out the right shoulder region; (4) another entered the right upper abdomen and exited above the right buttock region; and (5) the fifth wound was to the little finger of the right hand. The cause of death was any of the four primary wounds. There were only a few tiny pieces of bullet fragments left in the body. In the counter area of the store, behind where Mrs. Braswell had been sitting when she was shot, investigators found five bullet holes and numerous bullet fragments. Investigators also found five shell casings in the store.

In support of the [N.C. Gen. Stat.] § 15A-2000(e)(3) aggravating circumstance, the State introduced into evidence copies of three 1989 indictments and judgments showing that defendant had pled guilty to two counts of common law robbery and one count of armed robbery in connection with crimes committed in downtown Asheville in 1989.

3

Defendant served his sentence for those offenses and was released from prison in 1994.

Defendant presented evidence from several of his managers and supervisors, who were shocked when they heard that defendant was charged with murder. Defendant's wife testified that they had moved to Winston-Salem when her father became ill and required assistance with his construction business. Defendant helped run the business for five or six months during his father-in-law's illness. She testified that she never saw defendant exhibit any bizarre behavior and that he sometimes suffered from depression but took no medication for it. Defendant and his wife's family maintained a close relationship, gathering for cookouts at least twice a week and helping each other with household chores. Defendant's father-in-law testified that defendant did a good job running the construction business while he recuperated. He detected nothing in defendant's character or demeanor suggesting he suffered from any mental disability.

Dr. William B. Scarborough, Jr., an expert in psychology, testified that he examined defendant and diagnosed him with "major depression of a recurrent type with what we call some psychotic features" but admitted that he possessed no evidence that defendant suffered from a psychotic episode at the time of the murder. Dr. Scarborough also found alcohol dependence and could not rule out marijuana dependence. Dr. Scarborough described defendant's childhood as "constricted," as he was raised primarily by his great-grandmother, who was critical and mean, rarely allowed defendant and his brother to venture outside of her yard, and whipped the boys with whatever she had in her hand.

State v. Peterson, 350 N.C. 518, 522-24, 516 S.E.2d 131, 134-35 (1999).

II.

The North Carolina Supreme Court affirmed Petitioner's conviction and sentence on June 25, 1999. Id. The United States Supreme Court denied Petitioner's petition for writ of certiorari on February 22, 2000. Peterson v. North Carolina, 528 U.S. 1164, 120 S. Ct. 1181 (2000). Petitioner filed a Motion for

4

Appropriate Relief ("MAR") with the Superior Court of Richmond County on August 21, 2000, which was denied on August 29, 2001. Petitioner filed a second MAR on December 6, 2001, which was denied on grounds of procedural default on May 13, 2002. The North Carolina Supreme Court denied Petitioner's petitions for writ of certiorari to review both MAR orders on December 19, 2002. The United States Supreme Court denied Petitioner's petition for writ of certiorari on May 19, 2003.

Petitioner filed a Petition for Writ of Habeas Corpus in this Court on July 7, 2003. (Doc. # 2.) On November 17, 2004, the Magistrate Judge issued a Recommendation (Doc. # 18) that the habeas petition be denied and notice was served on the parties pursuant to 28 U.S.C. § 636(b). Petitioner timely filed objections to the Recommendation (Doc. # 20) and the State did not respond. This matter is ripe for consideration and the objected-to portions of the Recommendation will be reviewed de novo. See Fed. R. Civ. P. 72(b).

### III.

Federal courts are generally barred from reviewing habeas claims that were not reached on the merits in state court because of non-compliance with adequate and independent state procedural rules. See Coleman v. Thompson, 501 U.S. 722, 751, 111 S. Ct. 2546, 2565 (1991). A procedural rule under which the state court has declined to consider the merits of a petitioner's claims is adequate if it is regularly or consistently applied by the state court, Johnson v. Mississippi, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987 (1988), and is independent if it does

5

not "depend . . . on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75, 105 S. Ct. 1087, 1092 (1985).

A habeas court may review an otherwise procedurally defaulted claim, however, if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law. Coleman, 501 U.S. at 750, 111 S. Ct. at 2565; see also McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000). To demonstrate "cause," a petitioner may make "a showing that the factual or legal basis for the claim was not reasonably available to counsel." McCarver, 221 F.3d at 591 (quoting McCleskey v. Zant, 499 U.S. 467, 494, 111 S. Ct. 1454, 1470 (1991)). To establish "prejudice," a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 592 (quoting United States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982)).[2]

Habeas corpus claims that were adjudicated by the state courts on their merits must be reviewed under the deferential standard of review set forth in 28

---

[2] A second exception to the procedural default bar, which is not applicable in this case, applies when a petitioner can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750, 111 S. Ct. at 2565; see also McCarver, 221 F.3d at 588. The "fundamental miscarriage of justice" exception applies only to a narrow class of cases involving "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." McCleskey, 499 U.S. at 494, 111 S. Ct. at 1470.

6

U.S.C. § 2254(d), part of the Antiterrorism and Effective Death Penalty Act of 1996. Under Section 2254(d), a federal court reviews a state court adjudication to determine whether the decision was contrary to, or involved an unreasonable application of, clearly established federal law or whether the decision was based on an unreasonable determination of the facts.

A state court decision is "contrary to" federal law if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000). A state court decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407, 120 S. Ct. at 1520. "Unreasonable" is not the same as "incorrect" or "erroneous" and the reasonableness of the state court's decision must be judged from an objective, rather than subjective, standpoint. Id. at 409-10; 120 S. Ct. at 1521-1522. "[T]he criterion of a reasonable determination for purposes of § 2254(d) is not 'whether [the state court decision] is well reasoned,' but 'whether the determination is at least minimally consistent with the facts and circumstances of the case.'" Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000) (citing Wright v. Angelone, 151 F.3d 149, 157 (4th Cir. 1998)). As for questions

7

of fact, state court findings of fact are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

IV.

Petitioner objects to the Magistrate Judge's Recommendation regarding twelve of the seventeen claims for relief raised in his habeas petition.

A.

In Claim I, Petitioner contends that lead trial counsel was ineffective for misrepresenting to him the nature and scope of his Sixth Amendment rights pursuant to Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525 (1975). "An indigent person indicted for murder [in North Carolina] may not be tried where the State is seeking the death penalty without an assistant counsel being appointed." N.C. Gen. Stat. § 7A-450(b1). Petitioner claims that he withdrew a request to have the lead trial counsel appointed in his case discharged based on that counsel's misrepresentation that such a request would also terminate the representation by the appointed assistant counsel, who Petitioner favored.

Petitioner raised this claim for the first time in his second MAR and the state court denied the claim on procedural default grounds. Under North Carolina law, an MAR may be denied if, "[u]pon a previous motion [for appropriate relief], the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C. Gen. Stat. § 15A-1419(a)(1). The Magistrate Judge recommended upholding the state MAR court's denial of the

8

claim, and Petitioner objects.

Petitioner first argues that the procedural default rule is inadequate with regard to this claim, and does not foreclose consideration by this Court, because it has been inconsistently applied by the North Carolina courts. Petitioner argues in the alternative that the otherwise procedurally defaulted claim is excused under the "cause and prejudice" exception, and may, therefore, be considered on its merits.

Section 15A-1419(a)(1) of North Carolina General Statutes is generally recognized to be an independent and adequate state law ground for finding that a claim has been procedurally defaulted. See Brown v. Lee, 319 F.3d 162, 170 (4th Cir. 2003); Boyd v. French, 147 F.3d 319, 332 (4th Cir. 1998). The fact that a state procedural rule has been found to be generally adequate, however, is not determinative as to its adequacy in this particular case. If the procedural bar "ha[s] not been regularly and consistently applied by the state court to a particular type of federal constitutional claim, [it] cannot be considered an adequate state law ground barring federal court review of the merits of that claim." Brown, 319 F.3d at 170 (emphasis in original).

"[C]onsistent or regular application of a state rule of procedural default does not require that the state court show an undeviating adherence to such rule admitting of no exception so long as the rule has as a general rule been applied in the vast majority of cases." Mueller v. Angelone, 181 F.3d 557, 584 (4th Cir. 1999); see also Hathorn v. Lovorn, 457 U.S. 255, 263, 102 S. Ct. 2421, 2426

9

(1982) ("State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims.").  Otherwise, "state courts would be able to engage in an arbitrary application of state procedural rules to thwart federal habeas review of constitutional issues that the 'adequacy' requirement was designed to prevent."  Brown, 319 F.3d at 170.

To demonstrate that Section 15A-1419(a)(1) is inadequate in this particular case, Petitioner must "cite a non-negligible number of cases" in which the collateral review court failed to bar claims that were raised for the first time in subsequent MARs.  See McCarver, 221 F.3d at 589.  In support of his position, Petitioner relies solely on a Fourth Circuit case, Bacon v. Lee, 225 F.3d 470 (4th Cir. 2000), that is inapposite to the facts of this case.  In Bacon, the petitioner filed an MAR and notified the court of his intention to amend the motion with certain specified claims that could not be timely raised because of financial and time constraints. 225 F.3d at 475, 487.  Approximately five months later, after the initial MAR had been denied, the petitioner filed motions for reconsideration and for leave to amend the MAR to include the previously outlined claims.  Id.  The state court granted the motions, but ultimately construed the amended MAR to be a second MAR and found it to be procedurally barred.  Id.  While the majority in Bacon declined to make an adequacy determination, they found that "[b]ecause the state MAR court reopened the original MAR, the question of whether a governing state rule was regularly and consistently applied to treat a motion to amend thereafter as a

10

second MAR is in some doubt." Id. at 477.

In this case, however, no such doubt exists. Petitioner did not seek an amendment to or reconsideration of his original MAR, and the MAR court did not reopen the original MAR. Rather, Petitioner filed a second MAR presenting the claim at issue for the first time. Petitioner has failed to cite any cases where North Carolina collateral review courts have failed to bar claims that were raised for the first time in subsequent MARs. Accordingly, to proceed on the merits, Petitioner must establish cause for the default and prejudice resulting therefrom.

Petitioner contends that there is sufficient cause to overcome the procedural default. He argues that the factual basis underlying this claim was not reasonably available at the time the first MAR was filed because: (1) upon requesting removal of lead trial counsel, Petitioner was informed by lead trial counsel that such a request would also result in the removal of the assistant trial counsel, Petitioner's favored counsel; (2) there was no written memoranda in the case file to alert current counsel of lead trial counsel's statement; and (3) it is common for a client to change his mind about firing counsel.

Cause is "something external to the petitioner" that "cannot be fairly attributed to him." Coleman, 501 U.S. at 753, 111 S. Ct. at 2566. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Id. (quoting Murray

11

v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986)).  A petitioner

cannot establish cause when the facts underlying his claims were in existence and

were available upon a reasonably diligent search.  Rose v. Lee, 252 F.3d 676, 688

(4th Cir. 2007) (citing Murphy v. Netherland, 116 F.3d 97, 100 (4th Cir. 1997)).

In this case, current counsel was admittedly aware of Petitioner's original

desire to remove lead trial counsel well before the first MAR was filed.  With such

knowledge, current counsel should have reasonably discovered why Petitioner

decided not to pursue the removal.  Petitioner argues that lead trial counsel

deprived Petitioner of the tools to raise this claim by his misrepresentation.

Discovery of the information, however, would have simply required a single

probative question during the post-conviction investigation, or perhaps more candor

by Petitioner.  Either way, Petitioner has failed to make the requisite showing of

cause to excuse the procedural default of this claim.

## B.

In Claims IV and IX, Petitioner contends that lead trial counsel conceded

Petitioner's factual guilt without consent in violation of his Sixth Amendment right

to the effective assistance of counsel.  During closing argument of the sentencing

phase of trial, lead trial counsel argued that "there was larceny in [Petitioner's]

blood, but there was not murder in his blood."  (Doc. # 7, Ex. 2, Trial Tr. at 1440.)

While arguing that what happened in this case "was a panic killing" that "does not

justify the death penalty," counsel stated: "[Petitioner] did shoot Mrs. Braswell,

12

and he made a choice.  It might have just been a flicker of a moment, and premeditation and deliberation only require just the briefest time."  (Id.)

Petitioner raised these claims in his first MAR.  The state MAR court denied the claims on their merits, finding that Petitioner consented to counsel's admission of factual guilt and, alternatively, that he failed to establish ineffective assistance of counsel.  The Magistrate Judge recommended upholding the MAR court's denial of these claims.  Petitioner objects to the Magistrate Judge's statement of the controlling federal law and argues that unauthorized concessions of guilt constitute per se ineffective assistance of counsel.

First, it is clear from the record that Petitioner specifically authorized his trial counsel to admit his factual guilt.  On November 15, 1996, Petitioner signed the following authorization:

> I, Lawrence Eugene Peterson, Jr., intend to plead guilty to first degree murder based on premeditation and deliberation and armed robbery.
>
> I authorize my attorneys . . . to admit to the Court and Jury my guilt and that I shot and killed Jewel Braswell even though I do not admit my guilt.
>
> I particularly authorize my attorneys . . . to argue that the events took place as I stated in the written statement dated July 5, 1995 to [police].

(Doc. # 9, Tab B, Ex. D.)  In his statement to police, Petitioner recounted the following:

> I saw an old lady come out of the house and go in the store.  I went

13

back in the store and bought some shoe strings from the old lady. I came back out and tied down my top on my car. I saw my rifle in the front seat. I got my rifle and walked back in the store. I told the old lady to give me her money. The old lady said, "Oh God. I have a heart condition." I told her to open the cash register, and she did. I told the old lady to give me the money, and she gave me the cash from the cash register. She took the cash drawer out and handed me the drawer, and I sat the drawer on a counter top. I walked and looked around the store. I then shot wild and about two (2) times. <u>I then pointed my rifle at the old lady that was sitting in the chair, and I shot her about two (2) or three (3) times.</u> But before I started shooting, I saw the old man in the back of the store with a gun, and I panicked and started shooting. . . .

(Doc. # 9, Tab B, Ex. A) (emphasis added.)

Under North Carolina law, "[p]remeditation means that the act was thought out beforehand for some period of time, <u>however short</u>, but no particular amount of time is necessary for the mental process of premeditation." <u>State v. Conner</u>, 335 N.C. 618, 635, 440 S.E.2d 826, 835-36 (1994) (emphasis added). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose, and not under the influence of a violent passion, suddenly aroused by a lawful or just cause or legal provocation." <u>Id.</u> at 635, 440 S.E.2d at 836. The fact that Petitioner intentionally pointed his rifle at Mrs. Braswell and shot her multiple times is clearly sufficient to prove premeditation and deliberation. <u>See</u> <u>State v. Haynesworth</u>, 146 N.C. App. 523, 529, 553 S.E.2d 103, 108 (2001) (holding that a defendant pointing and firing a gun in the direction of the victim during a struggle was sufficient evidence to support a finding of premeditation and deliberation).

14

Petitioner's sole contrary evidence is his own affidavit dated August 18, 2000, stating that he "never told [his] attorneys that [he] shot Mrs. Braswell after premeditation and deliberation."  (Doc. # 9, Tab B, Ex. B ¶ 12.)  Not telling his attorneys that he acted with premeditation and deliberation, however, is different from not authorizing an admission of premeditation and deliberation.  Even if Petitioner's affidavit states that no such authorization was given, as Petitioner asserts in his objections, such a statement is belied by the record and falls well short of the clear and convincing evidence required to rebut the presumption of correctness afforded to the state MAR court's factual findings.  See 28 U.S.C. § 2254(e)(1).  Accordingly, Claims IV and IX are without merit.

Even assuming arguendo that Petitioner did not authorize trial counsel to admit factual guilt, a showing of deficient performance and actual prejudice is still required to establish ineffective assistance of counsel.[3]  See Florida v. Nixon, 543

_____

[3]  To establish an ineffective assistance of counsel claim, a "[petitioner] must show that counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms."  Strickland v. Washington, 466 U.S. 668, 688, 104 S. Ct. 2052, 2065 (1984).  A claim that counsel's assistance was so defective as to require habeas relief from a conviction or death sentence has two components:

> First, the [petitioner] must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment.  Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result was not reliable.

15

U.S. 175, 189-90, 125 S. Ct. 551, 561-62 (2004) (holding that defense counsel's failure to obtain defendant's express consent to a strategy of conceding guilt at the guilt phase of a capital trial should have been reviewed under the ineffective assistance of counsel standard prescribed in <u>Strickland</u>); <u>see</u> <u>also</u> <u>Clozza v. Murray</u>, 913 F.2d 1092, 1099-1100 (4th Cir. 1990) (applying the <u>Strickland</u> ineffective assistance of counsel standard to an unauthorized concession of guilt claim).  For the reasons set forth in the Recommendation, Petitioner failed to make such a showing.  The MAR court's denial of Claims IV and IX were neither contrary to nor an unreasonable application of established federal law.

C.

In Claim XII, Petitioner contends that his due process and confrontation rights were violated by a juror reading Biblical passages to other jury members during deliberations.  Petitioner also contends that the juror's reading of the Bible during deliberations necessarily proves that he made misrepresentations during voir dire in violation of Petitioner's right to a fair and impartial jury.

In the course of his post-conviction investigation, Petitioner learned that a juror read aloud from the Bible during deliberations.  Petitioner has presented affidavits of two jurors in support of his claims.  Juror Lisa Hammond Dixon stated in her affidavit that:

[a] male juror was very religious and carried a Bible with him.  He read

_____

<u>Id.</u> at 687, 104 S. Ct. at 2064.

some quotes from the Bible to the jury during deliberations. These passages seemed to suggest that there was support for imposing the death penalty. Very shortly after that, we unanimously agreed to the death verdict.

(Doc. # 9, Tab B, Ex. FF.) Juror Tammy West stated in her affidavit that:

[an] older black man on the jury read aloud from the Bible during the deliberations. He read several passages; I remember one of them was the 'eye for an eye' passage from the Old Testament.[4] I think that for some people who were not churchgoers, that might have had an effect on their thinking at the time.

(Doc. # 9, Tab B, Ex. HH.) Juror Clifton Mack was identified as the juror that read from the Bible based on Ms. West's description of an "older black man." (See Doc. # 9, Tab B, Ex. II.)

1.

Petitioner first contends that he was denied his Sixth Amendment right to a fair and impartial jury. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642 (1961). "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the

---

[4] While Ms. West does not specify which "eye for an eye" passage was read during jury deliberations, the Old Testament contains three such passages: (1) "Eye for eye, tooth for tooth, hand for hand, foot for foot," Exodus 21:24 (King James); (2) "Breach for breach, eye for eye, tooth for tooth: as he hath caused a blemish in a man, so shall it be done to him again," Leviticus 24:20 (King James); and (3) "And thine eye shall not pity; but life shall go for life, eye for eye, tooth for tooth, hand for hand, foot for foot," Deuteronomy 19:21 (King James).

extent commanded by the Sixth Amendment." <u>Morgan v. Illinois</u>, 504 U.S. 719, 727, 112 S. Ct. 2222, 2229 (1992). If a death sentence is imposed by a jury where a partial juror is empaneled, "the State is disentitled to execute the sentence." <u>Id.</u> at 728, 112 S. Ct. at 2229.

Petitioner argues that because Mr. Mack had such strongly held religious beliefs to quote an "eye for an eye" passage from the Old Testament during deliberations, he necessarily misrepresented his true beliefs during voir dire when he answered the following questions:

> MR. CRUMP [Petitioner's Attorney]: . . . . Mr. Mack, I just want a yes or no response. Do you feel that the death penalty should be automatically imposed in all cases of first-degree murder?
>
> MR. MACK: No.
>
> . . .
>
> MR. CRUMP: . . . . Mr. Mack, if the State fails to prove to you beyond a reasonable doubt that the aggravating circumstances when considered with the mitigating circumstances are sufficiently substantial to call for the imposition of the death penalty, will you return a verdict of life imprisonment without parole?
>
> MR. MACK: Yes, sir.

(Doc. # 7, Ex. 2, Trial Tr. at 256, 272).

To secure habeas relief on this contention, Petitioner must show that Mr. Mack "failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." <u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548, 556, 104

18

S. Ct. 845, 850 (1984).  The MAR Court and the Magistrate Judge agreed that Petitioner failed to show that Mr. Mack answered the voir dire questions at issue dishonestly.

It is clear that any juror who will automatically vote for the death penalty in every case, thereby failing to properly consider the evidence of aggravating and mitigating circumstances as the law requires, may be removed for cause.  Morgan, 504 U.S. at 729, 112 S. Ct. at 2229-30; see also N.C. Gen. Stat. § 15A-1212(8) ("A challenge for cause to an individual juror may be made by any party on the ground that the juror . . . [a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina.")  However, Petitioner's argument that Mr. Mack intentionally misrepresented his views on the death penalty is without merit.  The fact that Mr. Mack read an "eye for an eye" passage from the Bible during deliberations does not necessarily mean that he is a proponent of the automatic imposition of the death penalty in all cases of first-degree murder.

Further, even assuming that Mr. Mack had strongly held views in favor of the death penalty, it cannot be inferred from the affidavits submitted in this case that Mr. Mack was unable to apply the law as instructed.  See Jones v. Cooper, 311 F.3d 306 (4th Cir. 2002) (finding that a juror's strong support of the death penalty did not raise an inference that she could not properly apply the law as instructed).  Petitioner argues that Jones is distinguishable from this case because

19

the juror in question "lied about her relatives' brushes with the law," which "could have inured to the accused's benefit."  (Doc. # 20, Pet'r Objections at 24.)  While this is true, Petitioner's reading of the case is incomplete.  In Jones, the petitioner submitted an affidavit from an investigator reporting that "the challenged juror stated that several of her relatives had been subjected to arrests or jury trials . . . [and that she] had strong, religiously-motived views in favor of the death penalty." 311 F.3d at 311 (emphasis added).  "[T]he investigator's affidavit recounts the juror's belief 'that the Bible mandates imposition of the death penalty in every case of first degree murder,' and represents that, 'when [the investigator] asked her whether she could imagine any first degree murder case in which the death penalty would not be appropriate, she could not, other than if the defendant grew up in a jungle with no contact with humanity.'" Id. at 312.  The Court concluded, however, that "[i]t cannot be inferred from any statement in the affidavit that the juror could not disregard her personal feelings about the death penalty or apply the law as written, or that the juror lied when she stated that she could be a fair juror." Id.  The MAR court's denial of this claim was, therefore, neither contrary to nor an unreasonable application of established federal law.

2.

Petitioner next contends that his rights of due process and confrontation were violated by Mr. Mack's actions.  The Sixth Amendment provides, in relevant part, that: "the accused shall enjoy the right to . . . be confronted with the

20

witnesses against him." U.S. Const. amend. VI. "The right of confrontation requires that the 'jury's verdict must be based upon the evidence developed at the trial.'" <u>Robinson v. Polk</u>, 438 F.3d 350, 359 (4th Cir. 2006) (quoting <u>Turner v. Louisiana</u>, 379 U.S. 466, 472, 85 S. Ct. 546, 550 (1965)). In addition, the right to confrontation "'necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of defendant's right[s].'" <u>Id.</u> (quoting <u>Turner</u>, 379 U.S. at 472-73, 85 S. Ct. at 550).

"Despite these venerable protections afforded to criminal defendants, the Sixth Amendment does not require that all evidence introduced by a defendant tending to impeach the jury's verdict be considered by the courts." <u>Id.</u> Federal Rule of Evidence 606(b), which is identical to N.C. Gen. Stat. § 8C-1, Rule 606(b), codifies the "near-universal and firmly established common-law rule" that prohibits the admission of juror testimony to impeach a jury verdict. <u>Tanner v. United States</u>, 483 U.S. 107, 117, 107 S. Ct. 2739, 2746 (1987). The policy considerations underlying this rule include finality, protection of jurors from subsequent harassment by a losing party, and the encouragement of "frankness and freedom of discussion and conference" among jurors. <u>See</u> <u>McDonald v. Pless</u>, 238 U.S. 264, 267-68, 35 S. Ct. 783, 784 (1915). Rule 606(b) does, however, contain an exception to this general rule when "extraneous prejudicial information [is] improperly brought to the jury's attention." Fed. R. Evid. 606(b). Extraneous

21

prejudicial information "is information that was not admitted into evidence but nevertheless bears upon a fact at issue in the case." Robinson, 438 F.3d at 363.

The MAR court found this claim to have no merit, stating:

> [Petitioner] has submitted the affidavits of two jurors which are inadmissible because the affidavits are an attempt to impeach the jury's verdict by evidence that is not extraneous information about [Petitioner] or his case and are evidence of the "effect" that actions by Juror Mack had upon the jurors. Furthermore, even if the Court considers the affidavits, none of the evidence contained in the affidavit is about [Petitioner] or about [Petitioner's] case and there is no evidence to make even a prima facie showing that [Petitioner's] confrontation or due process rights were violated by the alleged incident.

(Doc. # 9, Tab E, MAR Order I at 14). The Magistrate Judge noted that the United States Supreme Court has not addressed whether reading from a Bible during jury deliberations constitutes extraneous prejudicial information and discussed a Fourth Circuit case, Burch v. Corcoran, 273 F.3d 577 (4th Cir. 2001), where it was held that a juror reading from a Bible during deliberations did not constitute an improper jury communication.

Petitioner objects to the Recommendation not differentiating between the Old Testament "eye for an eye" passage read by Mr. Mack in this case and the New Testament passages read by the juror in Burch. Petitioner argues that Mr. Mack's actions amounted to "an incitement to ignore the secular law of North Carolina and impose a sentence based on the religious law of ancient Israel," while the juror in Burch merely attempted "to comfort, or console, the other jurors

22

following their decision" to sentence the defendant to death. (Doc. # 20, Pet'r Objections at 24.) Recent Fourth Circuit authority, however, forecloses Petitioner's argument and compels the conclusion that Petitioner's claim is without merit.

In <u>Robinson</u>, a bailiff provided the jury with a Bible during the sentencing phase of a capital trial and a juror read an Old Testament "eye for an eye" passage during deliberations in an attempt to convince his fellow jurors to vote for a death sentence. 438 F.3d at 358-59. The Fourth Circuit held that the state court had reasonably applied established federal law in determining, without an evidentiary hearing, that the reading of a Bible during jury deliberations was an internal influence not subject to judicial inquiry. <u>Id.</u> at 363-66; <u>see also</u> <u>Lenz v. Washington</u>, 444 F.3d 295, 311-12 (4th Cir. 2006) (following <u>Robinson</u> and denying a similar habeas claim); <u>Lynch v. Polk</u>, 204 F. App'x 167, 174-75 (4th Cir. 2006) (same).

The <u>Robinson</u> decision was based on three alternative grounds. First, "it would have been reasonable for the MAR court to conclude that the Bible had no bearing on any fact relevant to sentencing," because "no Biblical passage . . . had any evidentiary relevance to the jury's determination of the existence of . . . aggravating and mitigating circumstances." <u>Robinson</u>, 438 F.3d at 363. Second, the Court found nothing in United States Supreme Court precedent that would require the conclusion that the Bible is the type of "external influence" that permits the jury deliberations to be examined in a post-trial inquiry. <u>Id.</u> at 363-64. Finally,

23

the Court determined that the state court "reasonably could have concluded that the safeguards of the trial process . . . provide an adequate protection of a defendant's right to be sentenced by a jury free of improper influences such that a post-verdict examination into Bible reading is unnecessary." Id. at 364.

Because the facts of this case are indistinguishable from Robinson, the state court's denial of this claim was neither contrary to nor an unreasonable application of established federal law.

D.

Petitioner's remaining objections to the Magistrate Judge's determination regarding Claims II, III, V, VI, VII, VIII, XI, and XVII are overruled for the reasons set forth in the Recommendation. The state courts' denial of these claims were neither contrary to nor an unreasonable application of established federal law.

V.

For the reasons set forth above, the Recommendation of the United States Magistrate Judge to deny habeas relief (Doc. # 18) is ADOPTED and the habeas petition (Doc. # 2) is DENIED.

This the day of April 26, 2007

                                                      /s/ N. Carlton Tilley, Jr.
                                                      United States District Judge